**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X
DEXLON CHARLES *et al.*,

                           Plaintiffs,                              <u>**ORDER**</u>

               -against-                       **22-cv-4232 (DEH) (JW)**

PINNACLE TOO, LLC *et al.*,

                           Defendants.
-----------------------------------------------------------------X
**JENNIFER E. WILLIS, United States Magistrate Judge:**

The Plaintiff, Dexlon Charles, is a journeyman who worked for Defendants Pinnacle Electric, Pinnacle Too, and FrankCrum. Plaintiff alleges that the Defendants imposed an improper rounding policy, deducted for meal breaks even when lunch was not taken, shaved overtime, and failed to provide required wage statements in violation of the New York Labor Law ("NYLL"). Dkt. Nos. 1, 76.

Now, Plaintiff moves to certify a Rule 23(b)(3) class and moves for final certification of a collective action under FLSA § 216 (b). Dkt. Nos. 76, 84. The Defendant moves to decertify the conditional class. Dkt. No. 116.

Because Plaintiff alleges Defendants' rounding, meal break, and time shaving policies were systematically applied to all the workers across the different worksites, and because proving the illegality of such policies necessitates the compilation of common proof, here, the common issues predominate over the individual ones. For this reason, Plaintiff has met his burden, and Plaintiff's Motion to certify a Rule 23(b)(3) class is GRANTED.

Finally, because Plaintiff has adequately linked the failure to provide wage statements to lost wages and because a wage notice is closely related to the historical analog of the *action for account*, Plaintiffs have Article III standing.

# I. BACKGROUND

Plaintiff seeks to certify a class of employees alleging Defendants violated New York Labor law. The Court will discuss factual matters to the extent necessary to resolve the Motion for Class Certification. See <u>In re Initial Pub. Offerings Sec. Litig.</u>, 471 F.3d 24, 41–42 (2d Cir. 2006).

## A. Factual Background

### 1. The Parties

Defendant Pinnacle Electric is "an electrical contractor for commercial and residential properties throughout New York City." Dkt. No. 119-1 at ¶ 2. Plaintiffs allege Defendant Agir and Defendant Pinnacle Too "effectively operate as the same company." Dkt. No.77 at 9. Frank Crum 6, Inc. is "a professional employer organization utilized by Pinnacle Electric." Dkt. No. 117 at 7.

Plaintiffs assert that "FrankCrum and Pinnacle are co-employers." Dkt. No. 77 at 10 (citing 78-6, Tischer Dep. at 8:3-12; 27:16-28:15). Plaintiffs allege "Pinnacle is responsible for day-to-day operations, FrankCrum is responsible for payroll administration, human resources services, and government compliance assistance." Dkt. No. 77 at 10 (citing 78-6, Tischer Dep. at 27:6-28:5). According to Plaintiffs, "Pinnacle reports its payroll to FrankCrum by providing the total hours worked for the pay period that is being processed." <u>Id</u>. Further, FrankCrum "has operational

control over employees on its payroll and has discretion to terminate the employees at its discretion." Id.

Pinnacle Electric assigns "employees to work across approximately 60 different job sites." Dkt. No. 117 at 7; Dkt. No. 119-1 at ¶ 4. Defendants highlight that "each worksite has a different foreman or supervisor." Dkt. No. 117 at 7. Defendants further point out that there "were approximately 40 different supervisors or foremen spread across all worksites." Dkt. No. 119-1 at ¶ 6.

Plaintiff, Dexlon Charles, worked for Defendant Pinnacle Electric as "a journeyman from September 2016 to March 2022." Dkt. No. 117 at 7. He performed "work at three primary job sites in Long Island City, Brooklyn, and Manhattan and other smaller projects." Id.

### 2. Rounding Policy Claim

Pinnacle Electric typically requires its employees to report directly to each job site at 7:00 a.m. at the beginning of each workday. Dkt. No. 119-2 at ¶ 3. As Defendant describes, "before starting work for the day, each employee is required to electronically clock in through a company provided tablet stationed at each job site or through a company provided application on their personal cell phones, at which time their photo is taken for identification purposes." Dkt. No. 117 at 8; Dkt. No. 119-2 at ¶ 4. Employees clock out using the same system at the end of the day, usually at 3:30 p.m. Id.

Defendants acknowledge that they had a policy that the starting time for employees who clocked in "from 6:10 a.m. to 7:10 a.m." would be "rounded to 7:00

a.m." Dkt. Nos. 119 at 18; 119-2 at ¶ 13.  The policy thus rounds up to fifty minutes in favor of the employer and ten minutes in favor of the employee.[1]

A different rounding policy applied to clocking out, "clock out times from 3:20 p.m. to 3:40 p.m. were rounded to 3:30 p.m." Dkt. Nos. 119 at 18; 119-2 at ¶ 13.

On the one hand, Defendant's Supervisor Mr. Schultz testified that "no employee was required to work before 7:00 a.m. and no activity related to work could be performed prior to 7:00 a.m. due to noise concerns and potential for fines." Dkt. No. 117 at 20; 119-2 at ¶ 13. Defendants claim the rounding policy is actually "an accommodation" to employees who "choose to arrive early" to "eat breakfast or choose their preferred tools." Id.

On the other hand, Plaintiffs allege "Defendants strongly encouraged Class Members to show up early to work." Dkt. No. 129 at 14 (citing Dkt. No. 130-2). Opt-in Plaintiff Levy stated in his deposition that the foreman said showing up before 7:00 a.m. was a "great idea," and that it was "well appreciated." Id. Plaintiff submits forty-seven affidavits where "employees allege that they began working prior to 7:00 a.m."[2]

_____

[1] The rounding policy changed over time: "from 2016 to 2017, clock in times from 6:10 a.m. to 7:10 a.m. were rounded to 7:00 a.m. and clock out times from 3:20 p.m. to 3:40 p.m. were rounded to 3:30 p.m. From 2018 to 2022, clock out times from 3:20 p.m. to 4:00 p.m. were rounded to 3:30 p.m. The rounding for clock in times did not change. As of 2023, clock in times from 6:45 a.m. to 7:15 a.m. are rounded to 7:00 a.m. and clock out times from 3:15 p.m. to 3:45 p.m. are rounded to 3:30 p.m. See Dkt. No. 119 at 18–19.

[2]  The specific phrasing in the affidavit is, "I would need to clock in at job sites then also have a photo taken of me, to prove I was properly on location. Once employees

4

### 3. **Meal Break Policy Claim**

During the workday, "all employees are entitled to…a 30-minute meal break," which is not compensated. Dkt No. 117 at 8; Dkt,. No. 119-1 at ¶ 10. Pinnacle Electric does not require employees to clock out for breaks. Id. ¶ 11. At the end of the work day, "employees are required to answer a series of questions, including confirming that they were able to take all breaks, including coffee breaks and meal breaks, during their shift." Dkt No. 117 at 8; Dkt,. No. 119-1 at ¶ 12.

The questionnaire includes the question, "Did you take all of your meals and breaks?" Plaintiffs allege that regardless of whether employees respond "yes" or "no," to this questionnaire, the Defendants automatically deduct thirty minutes from their wages. Dkt. No. 77 at 20.

### 4. **Time Shaving Claims**

Plaintiffs allege Defendants have a policy of systemic time-shaving. Dkt. No. 77 at 10-11. Plaintiffs allege the "timecards and pay records indicate a consistent failure by Defendants to account for all hours worked." Id. Plaintiffs claim "Defendants' own documentation and Defendants' own timekeeping data, received through the discovery process" establishes "two hundred and fifty examples[3] of on-the-record violations for different Opt-in Plaintiffs." Dkt. No. 129 at 5.

---

are clocked in and have their photo taken, they are available and ready for work." See Dkt. No. 78-3.

[3] Plaintiffs claim that due to page limitations they limited themselves to one example "per opt-in per claim." Dkt. No. 129 at 8.

### 5. Wage Notice & Paystub Claims

Plaintiffs allege that they did not receive any wage notices or pay stubs from Defendants throughout their employment. Dkt. No. 77 at 33; <u>see also</u> N.Y. Lab. L. §§ 195-1, 195-2, 195-3; 12 N.Y.C.R.R. § 146-2.2; 12 N.Y.C.R.R. § 146-2.3. Plaintiffs claim that while "such documents were requested in discovery, none have been provided." <u>Id.</u>

## B. Procedural Background

In May 2022, Plaintiff filed a Complaint alleging Defendants violated New York Labor Law ("NYLL"). Dkt. No. 1.  In September 2022, the Parties stipulated to conditionally certify a collective class under F.L.S.A. §216(b), and ninety-eight individuals opted into the lawsuit. Dkt. No. 35.

After "years of discovery," in September 2023, Plaintiffs moved to certify a Rule 23 class. Dkt. No. 76; Dkt. No. 117 at 4.  Plaintiff seeks to certify a class of "current and former non-exempt employees, including journeymen, electricians, laborers, and technicians, and assemblers employed by Agir Electrical, Ltd. from May 23, 2016," alleging violations of the New York Labor Law ("NYLL"). Dkt. Nos. 1, 76, 76-1. In October 2023, the Plaintiffs also moved for final collective certification of the § 216(b) class.

Defendants opposed the Rule 23 Motion and moved to decertify the §216(b) class. Dkt. Nos. 117 and 119. Briefs were fully submitted in April 2024.

Finally, general pretrial matters and nondispositive motions were referred to this Court. Dkt. No. 64.

## II. LEGAL STANDARDS

### 1.  Rule 23

A court may certify a class action only if it concludes, after a "rigorous analysis," that the proposed class meets the requirements of Rule 23(a) and (b). Comcast Corp. v. Behrend, 569 U.S. 27, 33–34 (2013). The "preponderance of the evidence standard applies to evidence proffered to establish Rule 23's requirements." Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008).

Pursuant to Rule 23(a), plaintiffs must demonstrate that: "(1) the class is so *numerous* that joinder of all members is impracticable; (2) there are questions of law or fact *common* to the class; (3) the claims or defenses of the representative parties are *typical* of the claims or defenses of the class; and (4) the representative parties will *fairly and adequately* protect the interests of the class." Fed. R. Civ. P. 23(a) (emphasis added). Rule 23 also includes an implied requirement of "ascertainability" under which "a class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries." In re Petrobras Sec., 862 F.3d 250, 257 (2d Cir. 2017).

"Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345 (2011). Under Rule 23(b)(3), plaintiffs must show that "questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair

and efficient adjudication of the controversy." Fed R. Civ. P. 23(b)(3) (emphasis added).

### 2. FLSA Collective Actions Under § 216(b)

The second circuit has "endorsed a two-step process for certifying FLSA collective actions" and requires opt-in plaintiffs to be "similarly situated." <u>Scott v. Chipotle Mexican Grill, Inc.</u>, 954 F.3d 502, 515 (2d Cir. 2020).

At step one, the district court permits a notice to be sent to potential opt-in plaintiffs "if the named plaintiffs make a modest factual showing that they and others together were victims of a common policy or plan that violated the law." <u>Id.</u> At step two, "with the benefit of additional factual development, the district court determines whether the collective action may go forward by determining whether the opt-in plaintiffs are in fact similarly situated to the named plaintiffs." <u>Id.</u>

The requirements for certifying a class under Rule 23 are "more stringent than" the requirements for conditional collective action certification under § 216(b). <u>Scott</u>, 954 F.3d at 520.

### 3. Article III Standing

Article III standing requires a plaintiff to show "[i] an injury in fact, [ii] a causal connection between that injury and the conduct at issue, and [iii] a likelihood that the injury will be redressed by a favorable decision." <u>Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.</u>, 19 F.4th 58, 62 (2d Cir. 2021) (quoting <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears

the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." <u>Fac. v. N.Y.U</u>., 11 F.4th 68, 76 (2d Cir. 2021).

"To demonstrate injury in fact, a plaintiff must show the invasion of a [i] legally protected interest that is [ii] concrete and [iii] particularized and [iv] actual or imminent, not conjectural or hypothetical." <u>Maddox</u>, 19 F.4th at 62 (quoting <u>Strubel v. Comenity Bank</u>, 842 F.3d 181, 188 (2d Cir. 2016); <u>Isayeva v. Diamond Braces</u>, No. 22-CV-4575 (KPF), 2024 WL 1053349 (S.D.N.Y. Mar. 11, 2024).

In <u>TransUnion</u>, the Supreme Court held that a "plaintiff's injury in fact" must "be 'concrete'—that is, 'real, and not abstract.'" <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 424 (2021). The Court explained, "courts should assess whether the alleged injury to the plaintiff has a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." <u>TransUnion</u>, 594 U.S. at 424.

For injuries arising out of an alleged violation of a statute, the Supreme Court explained that courts "may not assume that the existence of a statutory prohibition or obligation automatically elevates that prohibition or obligation to a harm that is concrete under Article III." <u>See</u> <u>Isayeva</u>, 2024 WL 1053349 at 15 (citing <u>TransUnion</u>, 594 U.S. at 424-26). "For standing purposes, therefore, an important difference exists between (i) a plaintiff's statutory cause of action to sue a defendant over the defendant's [statutory] violation ..., and (ii) a plaintiff's suffering concrete harm because of the defendant's [statutory] violation." <u>Id.</u>

## III. DISCUSSION

### 1. Rule 23(a)

Rule 23(a) requires Plaintiffs to establish ascertainability, numerosity, commonality, typicality, and adequacy. Fed. R. Civ. P. 23(a). This Court will analyze each of these requirements in turn.

#### A. Ascertainability

Plaintiff seeks to certify a class of "current and former non-exempt employees, including journeymen, electricians, laborers, and technicians, and assemblers employed by Agir Electrical, Ltd. from May 23, 2016," alleging violations of the New York Labor Law ("NYLL"). Dkt. Nos. 1, 76, 76-1.

Thus, membership in the proposed class can easily be ascertained by reference to Defendants' own employment records. See Ye v 2953 Broadway Inc., 18-cv-4941, (JHR)(JW), Dkt. No. 175 (S.D.N.Y., April 26, 2024). Because this Proposed Class is sufficiently definite to allow the Court to ascertain its members, Plaintiffs have satisfied Rule 23's ascertainability requirement. In re Petrobras Sec., 862 F.3d at 260.

#### B. Numerosity

Numerosity is satisfied where, "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). Numerosity is "presumed" at a level of "40 members or more." Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir.1995). There are already ninety-eight opt-in Plaintiffs. Dkt. No. 77 at 9. Moreover, Plaintiff has submitted forty-seven affidavits alleging similar wage violations. Dkt. No. 78-3. Thus, numerosity is met.

### C. Commonality

Commonality requires Plaintiffs to establish the existence of a common question of law or fact. Elisa W. v. City of New York, 82 F.4th 115, 122 (2d Cir. 2023). "This requirement has been characterized as a low hurdle." McIntire v. China MediaExpress Holdings, Inc., 38 F. Supp. 3d 415, 424 (S.D.N.Y. 2014). For purposes of Rule 23(a)(2), "even a single common question will do." Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 359 (2011).

In the FLSA context, the Second Circuit has found that "class claims all derive[d] from the same compensation policies" satisfy commonality. Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 252 (2d Cir. 2011). Similar claims by workers that their employers have unlawfully denied them wages have "repeatedly been held to meet the commonality prerequisite for class certification." Espinoza v. 953 Assocs. LLC, 10-CV-5517 (SAS), 280 F.R.D. 113, 127 (S.D.N.Y. 2011).

Plaintiffs allege "all non-exempt employees" are "subject to all the same unlawful employment practices." Dkt. No. 77 at 39. They identify five practices: 1) Defendants' rounding policy, 2) Defendants' meal break deduction policy, 3) whether Defendant engaged in a policy of systemic time-shaving, 4) Defendants' failure to provide wage notices, and 5) Defendants' failure to provide wage statements. Dkt. No. 77 at 39.

These "common contentions" on issues of law and fact are "capable of classwide resolution" because "determination of [their] truth or falsity will resolve an issue that

is central to the validity of each one of the claims in one stroke." <u>Wal-Mart Stores, Inc. v. Dukes</u>, 564 U.S. 338, 350 (2011).

Moreover, as Rule 23(b)(3)'s predominance inquiry is a "far more demanding" version of the commonality inquiry, common issues will be discussed in deeper detail below. <u>See</u> <u>Allen v. City of New York</u>, No. 19-CV-03786 (JMF), 2022 WL 4133132, at *1–2 (S.D.N.Y. Sept. 12, 2022).

### D. Typicality

"Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." <u>Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.</u>, 504 F.3d 229, 245 (2d Cir. 2007); <u>see also</u> <u>Schear v. Food Scope Am.</u>, Inc., 297 F.R.D. 114, 124 (S.D.N.Y. 2014); <u>Whitehorn v. Wolfgang's Steakhouse, Inc.</u>, 275 F.R.D. 193, 199 (S.D.N.Y.2011). Typicality and commonality "tend to merge into one another, so that similar considerations animate analysis" of the requirements.  <u>See also</u> <u>Lapin v. Goldman Sachs & Co.</u>, 254 F.R.D. 168, 175 (S.D.N.Y. 2008).

In <u>Shahriar v. Smith & Wollensky Rest. Grp., Inc.</u>, the Second Circuit affirmed the district court's finding that typicality was satisfied where employment "practices affected every plaintiff" and plaintiffs submitted evidence of "a common policy and practice" of underpayment. <u>Shahriar v. Smith & Wollensky Rest. Grp., Inc.</u>, 659 F.3d 234, 252 (2d Cir. 2011). Similarly here, Plaintiffs allege that their claims arise from

Defendants' common practices which affected all members of the Proposed Class. Dkt. No. 77 at 39. Thus, "the alleged harms suffered by Plaintiffs are typical of those of the class they seek to represent." <u>Fonseca v.Dircksen & Talleyrand Inc</u>., No. 13-CV-5124 AT, 2015 WL 5813382, at *4 (S.D.N.Y. Sept. 28, 2015).

Thus, typicality is also satisfied.

### E. Adequacy

- **Adequate Representative**

The adequacy requirement is satisfied where 1) plaintiff's interests are not antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation. <u>See</u> <u>Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp</u>., 222 F.3d 52, 60 (2d Cir. 2000) (citing <u>In re Drexel Burnham Lambert Group, Inc</u>., 960 F.2d 285, 291 (2d Cir.1992)).

In an affidavit, Plaintiff has stated his willingness, and demonstrated his ability, to adequately represent the Class. <u>See</u> Dkt. No. 31 ¶ 24-26. Moreover, the fact that Plaintiffs' claims "are typical of the class is strong evidence that their interests are not antagonistic to those of the class." <u>Damassia v. Duane Reade, Inc.</u>, 250 F.R.D. 152, 158 (S.D.N.Y. 2008). Thus, the court is satisfied that this element of the adequacy requirement has been fulfilled.

- **Adequate Counsel**

Fed. R. Civ. P. 23(g) guides the court's assessment of proposed class counsel. <u>See</u> Fed. R. Civ. P. 23, Advisory Committee Notes, 2003 Amendment, Subdivision (g). Pursuant to Rule 23(g), the court "must consider: (i) the work counsel has done in

identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class" and "may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Id.

Plaintiff's counsel has been appointed class counsel in "over 100 court-approved wage and hour class and collective actions," and clearly has the requisite experience. Dkt. No. 78-20. Moreover, the Second Circuit has noted that "skilled and zealous representation [is] expected of class counsel under Rule 23(g)." Jin v. Shanghai Original, Inc., 990 F.3d 251, 263 (2d Cir. 2021). Mr. Lee has aggressively litigated this case. See e.g. Dkt. Nos. 58 and 83. The Court expects he will continue to do so in the future.

### 2. Rule 23(b)(3)

Plaintiffs here seek class certification under Rule 23(b)(3). Dkt. No. 77. 23(b)(3) requires Plaintiffs to establish that (1) common issues among class members predominate over individual issues and (2) a class action is the superior method for adjudication. Fed R. Civ. P. 23(b)(3). This Court will analyze each of these requirements in turn.

### A. Predominance

Rule 23(b)(3)'s predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prod., Inc.

v. Windsor, 521 U.S. 591, 594 (1997). Plaintiff "bears the burden" of satisfying Rule 23's requirements. See Martinek v. AmTrust Fin. Servs., Inc., No. 19-CV-8030 (KPF), 2022 WL 326320, at *4–8 (S.D.N.Y. Feb. 3, 2022)(citing In re Patriot Nat'l, Inc. Sec. Litig., 828 F. App'x 760, 764 (2d Cir. 2020) (summary order).

To satisfy this requirement, plaintiffs must establish that the relevant "legal or factual questions that qualify each class member's case…can be achieved through generalized proof" and "these particular issues are more substantial than the issues subject only to individualized proof." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010)(quoting Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002). "Some factual variation among the circumstances of the various class members is inevitable and does not defeat the predominance requirement." Iglesias-Mendoza v. La Belle Farm, Inc., 239 F.R.D. 363, 373 (S.D.N.Y. 2007).

"The requirement's purpose is to ensure that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010).

Defendants argue that individual issues cloud any cohesive class analysis. The Court will discuss why the predominance prong is satisfied for each policy.

### i. Rounding Policy

As discussed above, Defendants acknowledge that they had a policy that the starting time for employees who clocked in "from 6:10 a.m. to 7:10 a.m." would be "rounded to 7:00 a.m." Dkt. Nos. 119 at 18; 119-2 at ¶ 13.

Defendant's Supervisor Mr. Schultz testified that "no employee was required to work before 7:00 a.m. and work related activity could be performed prior to 7:00 a.m. due to noise concerns and potential for fines." Dkt. No. 117 at 20; 119-2 at ¶ 13.

Defendants argue that "some employees" simply "have misunderstood . . . policies," Dkt. No. 119 at 8 (citing <u>Russo v. Bellsouth Telecomms., Inc</u>., 2009 U.S. Dist. LEXIS 20552, *28 (N.D. Ga. 2009)).  Indeed, Defendants claim the rounding policy is actually "an accommodation" to employees who "choose to arrive early" to "eat breakfast or choose their preferred tools." <u>Id.</u>

Defendants argue that any work employees performed before 7am was "de minimis." Dkt. No. 135 at 11. Defendants argue that an inquiry into whether the work was de minimis would necessitate numerous "mini-trials." <u>Id.</u> Defendants argue that individual issues predominate on the rounding issue because "Pinnacle Electric has shown that it did not have an improper rounding policy and…there are no viable class claims." Dkt. No 119 at 26.  Defendants argue courts have held that rounding policies are not "unlawful as long as it averages out in the long-term." Dkt. No 119 at 26 (citing <u>Utne v. Home Depot U.S.A., Inc</u>., No. 16-cv-01854-RS, 2017 WL 5991863, 2017 U.S. Dist. LEXIS 199184, at *8 (N.D. Cal. Dec. 4, 2017)).

On the other hand, Plaintiffs argue the policy is unfair "on its face." Dkt. No. 129 at 14. Plaintiffs allege "Defendants strongly encouraged Class Members to show up early to work." Dkt. No. 129 at 14 (citing Dkt. No. 130-2). Opt-in Plaintiff Levy stated in his deposition that the foreman said showing up before 7:00 a.m. was a "great idea," and that it was "well appreciated." Id.

Furthermore, Plaintiffs argue that it is "commonsensical to assume that Class Members begin their work upon clocking-in." Dkt. No. 129 at 13. Plaintiff points to numerous examples, such as opt-in Plaintiff Ferdinand, who clocked in at 6:16 a.m. Id. Plaintiff argues this raises an inference that the employees were routinely expected to begin work upon clocking in. Id. On top of that, Plaintiff submits forty-seven affidavits where "employees allege that they began working prior to 7:00 a.m."[4]

Ultimately, the Court "need not reach the merits of these common questions at the certification stage." Onate v. AHRC Health Care, Inc., No. 20-CV-8292 (AS), 2023 WL 8648167, at *3 (S.D.N.Y. Dec. 14, 2023); Flores v. Anjost Corp., 284 F.R.D. 112, 122 (S.D.N.Y. 2012); Perez v. Isabella Geriatric Ctr., Inc., No. 13-CV-7453 (RA), 2016 WL 5719802, at *2 (S.D.N.Y. Sept. 30, 2016). For class certification, "it is sufficient that Plaintiffs have demonstrated that the alleged violations "depend upon a common contention." Wal-Mart Stores, 564 U.S. at 350; Onate v. AHRC Health Care, Inc., 2023 WL 8648167 at *3. Plaintiffs "need not prove that the legal or factual issues that

---

[4] The specific phrasing in the affidavit is, "I would need to clock in at job sites then also have a photo taken of me, to prove I was properly on location. Once employees are clocked in and have their photo taken, they are available and ready for work." See Dkt. No. 78-3.

predominate will be answered in their favor." <u>Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds</u>, 568 U.S. 455, 468 (2013).

Moreover, courts in this district have certified 23(b)(3) classes for similar allegations of improper rounding policies.

In <u>Onate</u>, the Court certified a class where the plaintiff "submitted timesheets…demonstrating the impact of the rounding policy." <u>Onate v AHRC Health Care, Inc.</u>, 20-CV-8292 (AS), 2023 WL 8648167, at *4 (SDNY 2023). The Court distinguished <u>Walmart v. Dukes</u>, cited by the Defendant here, saying "there is nothing suggesting that this rounding practice did (or even could) vary depending on an employee's supervisor." <u>Id.</u> Here, while Defendants argue that each supervisor would determine when to start to work and would assign initial tasks for the day, the local supervisors had no control over the uniform rounding policy.

As in <u>Onate</u>, "whether these policies exist and how they operate are subject to common proof." <u>Id.</u> If each opt-in plaintiff proceeded separately via ninety-eight different actions, they would consistently seek identical discovery, hold duplicate depositions, and introduce all the same evidence at trial. Each Plaintiff would certainly seek to include other plaintiffs' allegations of rounding to demonstrate that the policy was not an inadvertent or isolated mishap. Thus common proof would likely be used at trial in an attempt to establish Defendants' alleged willfulness. <u>See</u> Dkt. No. 1 at ¶ 89 (alleging willful violations of NYLL). Thus, for multiple reasons, this case is analogous to <u>Onate</u>.

Moreover, Defendants themselves explain that the rounding policy permits employees to "choose their preferred tools." Dkt. No. 117 at 20; 119-2 at ¶ 13. In <u>Diaz</u>, the Court held that it was still proper to certify a 23(b)(3) class despite the fact that the plaintiff pavers belonged to "varying crews" that required "different tools to complete a day's work." <u>Diaz v. New York Paving Inc.</u>, No. 18-CV-4910 (ALC), 2023 WL 3853308, at *4–5 (S.D.N.Y. Mar. 31, 2023). As here, the defendant in <u>Diaz</u> argued that those "differences would raise the prospect of "mini-trials" to establish whether the preparatory work met the threshold." <u>Id.</u> Like in <u>Diaz</u>, "all" Pinnacle Electric employees "are equally invested in the resolution of whether their preliminary and postliminary work" choosing tools is compensable. <u>Id.</u>

Thus, with respect to whether Defendant's rounding policy is unlawful, common issues predominate over individual ones, and Rule 23 (b)(3) is satisfied.

### ii. Unpaid Meal Break Policy

Defendants argue that opt-in Plaintiffs testified "whether they received a meal break, differed from site to site." Dkt. No. 135 at 4. But according to Defendants themselves, at the end of the work day, "employees are required to answer a series of questions, including confirming that they were able to take all breaks, including coffee breaks and meal breaks, during their shift." Dkt No. 117 at 8; Dkt,. No. 119-1 at ¶ 12. The questionnaire includes the question, "Did you take all of your meals and breaks?" <u>Id.</u>

Plaintiffs do not dispute that meal break policies may have differed from site to site. Rather, Plaintiffs allege that regardless of whether employees respond "yes"

or "no," to this questionnaire, the Defendants automatically deducted thirty minutes from their wages. Dkt. No. 77 at 20.

Like with the rounding policy, were each plaintiff to proceed separately, they would each seek to invoke each other's questionnaires to prove the existence and willfulness of Defendant's policy.

Other courts in this district have certified 23(b)(3) classes for alleged meal break violations. In <u>Grande</u>, the Court held that "the legality of defendants' various wage and hour practices and policies" on "rounding policies…and meal breaks…are subject to generalized, rather than individual, proof." <u>Grande v. 48 Rockefeller Corp.</u>, No. 21-CV-1593(PGG)(JLC), 2023 WL 5162418, at *24 (S.D.N.Y. Aug. 11, 2023). In <u>Onate</u>, the Court rejected the type of arguments that the Defendants make in opposition here, holding that "common proof may be used to demonstrate" a defendant's "knowledge and contradict" the "assertion that liability will turn on whether an individual's supervisor knew or should have known" that the "auto-deduction policy was not accounting for time employees were working during lunch." <u>Onate</u>, 2023 WL 8648167, at *8.

Thus, common issues predominate for the meal break policy allegations.

**iii. Overtime**

Plaintiffs claim that Defendants systematically engaged in a "routine and constant policy of timeshaving." Dkt. No. 129 at 11. Plaintiffs argue this is established by "Defendants' own documents." <u>Id.</u>

20

Defendants argue that resolving this claim "requires an individualized review of each putative class member's alleged work hours, overtime claim…and alleged hours lost due to time shaving…and whether they actually worked the hours claimed." Dkt. No. 119 at 26.

However, numerous courts have held that questions of liability concerning whether workers were supposed to be "paid for overtime and were not are about the *most perfect* questions for class treatment." Lawrence v. NYC Med. Prac., P.C., No. 1:18-CV-8649-GHW, 2024 WL 307842, at *8 (S.D.N.Y. Jan. 26, 2024) (citing Iglesias-Mendoza v. La Belle Farm, Inc., 239 F.R.D. 363, 373 (S.D.N.Y. 2007).

Courts in this district have "consistently found that the types of individual questions that exist in wage-and-hour cases, such as the hours worked or the exact damages to which each plaintiff might be entitled, do not defeat the predominance requirement." Gonzalez v. Hanover Ventures Marketplace LLC, No. 21-CV-1347 (ER), 2024 WL 1157074, at *7 (S.D.N.Y. Mar. 18, 2024); see In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 123 n. 8 (2d Cir. 2013); Vargas v. Howard, 15–CV–5101–GHW, 324 F.R.D. 319, 329 (S.D.N.Y. 2018) (collecting cases); Schear v. Food Scope Am., Inc., 12-CV-594 (AT), 297 F.R.D. 114, 126 (S.D.N.Y. 2014). Moreover, Defendants' time records would be "common proof" for all potential plaintiffs. Onate, 2023 WL 8648167, at *8; Dukes, 564 U.S. at 350.

This is not, as Defendants argue, a case like Scott v. Chipotle Mexican Grill, Inc., 954 F.3d 502 (2d Cir. 2020). There, the Court held it would be improper to determine on a classwide basis whether the employees were exempt managers

21

because some plaintiffs "recounted independently running their own stores while others testified to exercising very few, if any, managerial duties." <u>Scott</u>, 954 F.3d at 508–09. In <u>Scott</u>, individualized inquiries were required to determine the level of discretion each employee possessed. Here, the character of the plaintiffs duties is irrelevant to the question of whether they are owed overtime. Unlike in <u>Scott</u>, Defendants do not argue that the potential plaintiffs are exempt managers.

Thus, Plaintiffs' overtime and timeshaving claims also meet the 23(b)(3) standard. <u>Onate</u>, 2023 WL 8648167, at *8; <u>Dukes</u>, 564 U.S. at 350.

### iv. Wage Notice & Wage Statement Claims

New York imposes statutory notice and record-keeping requirements under the NYLL. In particular, NYLL § 195(1) requires employers to give their employees, at the time of hiring, written notice containing the employee's rate of pay, allowances, and various other information relating to the computation of plaintiff's pay at the time of hiring. <u>See</u> <u>Isayeva v. Diamond Braces</u>, No. 22 CIV. 4575 (KPF), 2024 WL 1053349, at *15 (S.D.N.Y. Mar. 11, 2024). Thereafter, NYLL § 195(3) "requires employers to provide, for each pay period, a wage statement showing how that pay was computed, including deductions." <u>Id.</u>

Plaintiffs allege that they did not receive any wage notices or pay stubs from Defendants throughout their employment. Dkt. No. 77 at 33; <u>see also</u> N.Y. Lab. L. §§ 195-1, 195-2, 195-3; 12 N.Y.C.R.R. § 146-2.2; 12 N.Y.C.R.R. § 146-2.3. Plaintiffs claim that while "such documents were requested in discovery, none have been provided." <u>Id.</u>

Defendants argue that Plaintiffs lack standing under Article III to bring wage notice and wage statement claims. This will be addressed in depth below.

Moreover, Defendants argue that the standing analysis would necessitate an individualized inquiry into whether each class member was harmed by the failure to receive the wage notices and wage statements. Dkt. No. 119 at 29. Because of this they argue the potential Plaintiffs "cannot maintain a class action for failure to receive accurate wage statements or wage notices." Id.

Defendants miss the mark. As described in a case decided this September, for "the purposes of class certification, s]tanding is satisfied so long as *at least one* named plaintiff can demonstrate the requisite injury." Martinenko v. 212 Steakhouse, Inc., No. 1:22-cv-00518 (JLR), 2024 WL 4275286, at *5 (S.D.N.Y. Sept. 24, 2024)(citing Hyland v. Navient Corp., 48 F.4th 110, 117-18 (2d Cir. 2022) and In re AXA Equitable Life Ins. Co., No. 16-cv-00740 (JMF), 2023 WL 199284, at *1 (S.D.N.Y. Jan. 17, 2023).

Here, the "class definition used ... makes clear that all the class members were subject to the policies at issue," which is "standing sufficient to maintain the certification of the class." Chen-Oster v. Goldman, Sachs & Co., No. 10-cv-06950 (AT) (RWL), 2022 WL 814074, at *20 (S.D.N.Y. Mar. 17, 2022). The "possibility that a well-defined class will nonetheless encompass some class members who have suffered no injury ... is generally unproblematic as the non-injured parties can just be sorted out at the remedies phase of the suit." In re AXA., 2023 WL 199284, at *2; see also Seijas v. Republic of Argentina, 606 F.3d 53, 56–58 (2d Cir. 2010); Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 91 (2d Cir. 2015); Cent. States Se. & Sw. Areas Health &

Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 241 (2d Cir. 2007).

Here, Plaintiff presents questions of law common to the class. Moreover, whether the various proposed plaintiffs were concretely harmed by the failure to provide wage notices and statements is a question that, like liability, may be susceptible to common proof. See e.g. Acton v. Powerline Cycles, Inc., No. 22 Civ. 4305 (AEK), 2024 WL 4388483 (S.D.N.Y. Oct. 3, 2024)(finding no standing when no wages were owed and no other violations of NYLL).

Thus, Plaintiff's wage notice and wage statement claims meet the predominance standard. See Dukes, 564 U.S. at 350.

### B. Superiority

Under the superiority prong of 23(b)(3), the Court must consider "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." In re Scotts EZ Seed Litig., 304 F.R.D. 397, 415 (S.D.N.Y. 2015).

"Courts routinely hold that a class action is superior where, as here, potential class members are aggrieved by the same policy, [and] the damages suffered are small in relation to the expense and burden of individual litigation[.]" Schear, 297 F.R.D. at 126. In Hart v. Rick's Cabaret Int'l Inc., the court found that a class action was the

superior method of litigating employees' FLSA claims where individual lawsuits would not be cost effective and purported class members were presumed to be low-income. Hart v. Rick's Cabaret Int'l Inc., No. 09-CV-3043 (JGK), 2010 WL 5297221, at *7 (S.D.N.Y. Dec. 20, 2010). Similarly here, all Proposed Class members have analogous wage claims which may "not be worth the time, effort or money to litigate individually." Id. As the Second Circuit has noted, "Rule 23(b)(3) class actions can be superior precisely because they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 130 (2d Cir. 2013) (citing Amchem Prods., Inc., 521 U.S. at 617).

Finally, "many of the putative class members remain employed by Defendants, and may therefore be unwilling to bring individual claims for fear of retaliation." See Mangahas v. Eight Oranges Inc., No. 22-CV-4150 (LJL), 2024 WL 2801922, at *11–13 (S.D.N.Y. May 31, 2024).

Thus, this Court is satisfied that both the predominance and superiority requirements of Rule 23(b)(3) are met.

### 3. FLSA § 216(b) Class

The Second Circuit has explained that "Rule 23 and § 216(b) serve fundamentally different purposes." Scott, 954 F.3d at 519–20. Rule 23 provides a "general procedural mechanism for the resolution of claims on a class-wide basis subject to the sound discretion of the district court." Id. § 216(b), by contrast, is "tailored specifically to vindicating federal labor rights, and where the conditions of

§ 216(b) are met, employees have a substantive "right" to proceed as a collective, a right that does not exist under Rule 23." Id.

The Second Circuit has held that "the requirements for certifying a class under Rule 23 are unrelated to and more stringent than the requirements for "similarly situated" employees to proceed in a collective action under § 216(b)." Id. Accordingly, "it is error for courts to equate the requirements of § 216(b) with those of Rule 23 in assessing whether named plaintiffs are "similarly situated" to opt-in plaintiffs under the FLSA." Id.

A determination of whether plaintiffs are "similarly situated" requires a court to ask "whether they share one or more similar questions of law or fact material to the disposition of their FLSA claims." Id. at 521. As discussed above, Plaintiffs have established that there are several similar questions of both fact and law material to the disposition of their claims.

Thus, Plaintiffs also meet the standard for a collective action under FLSA § 216(b) and Defendants' Motion to decertify the class is DENIED. As the Court grants Plaintiffs' motion to Certify a Class under Rule 23 and appoints Mr. Lee counsel for all class members including the opt-in plaintiffs, Plaintiffs' Motion for Final Collective Certification is DENIED as moot.[5]

---

[5] If however, the Rule 23 class is decertified, Plaintiffs may proceed as a collective action under FLSA 216(b).

26

### 4. Article III Standing

#### a) The Parties' Arguments

Defendants argue that recent case law "makes clear that Plaintiff lacks standing" to assert wage statement and wage notice claims under the NYLL. Dkt. No. 119 at 28(citing <u>Sevilla v. House of Salads One LLC</u>, 2022 WL 954740 (E.D.N.Y. Mar. 30, 2022); <u>Wang v. XBB, Inc</u>., 2022 WL 912592 (E.D.N.Y. Mar. 29, 2022); <u>Francisco v. NY Tex Care, Inc</u>., 2022 WL 900603 (E.D.N.Y. Mar. 28, 2022); <u>Mahon v. Ticor Title Ins. Co</u>., 683 F.3d 59, 64 (2d Cir. 2012); <u>Garrido v. House of Salads One LLC,</u> 2022 WL 954740 (E.D.N.Y. Mar. 30, 2022).

Plaintiff counters that "the majority of courts in this circuit" considering the issue permit wage statement and wage notice claims. Dkt. No. 129 at 16 (citing <u>Heckle v. Matrix Absence Mgmt., Inc.,</u> No. 21 CV 1463 (VB), 2022 WL 17666401 (S.D.N.Y. Dec. 14, 2022)); <u>Lipstein v. 20X Hosp. LLC,</u> No. 22-CV-04812 (JLR) (JW), 2023 WL 6124048 (S.D.N.Y. Sept. 19, 2023)); <u>Thompson v. Elev8 Ctr. New York, LLC,</u> No. 20-CV-9581(PGG)(JLC), 2023 WL 4556045 (S.D.N.Y. July 17, 2023), report and recommendation adopted, No. 20-CV-9581(PGG)(JLC), 2023 WL 6311591 (S.D.N.Y. Sept. 28, 2023).

#### b) <u>Guthrie</u>

Neither Party addressed the Second Circuit's most recent decision–<u>Guthrie</u>–as that decision was issued after the Parties submitted their briefs. <u>See</u> <u>Guthrie v. Rainbow Fencing Inc</u>., 113 F.4th 300 (2d Cir. August 30, 2024).

In <u>Guthrie</u>, the Second Circuit recognized "a disagreement among the district courts" on this issue. <u>Guthrie</u>, 113 F.4th at 305. The Second Circuit held that "a plaintiff cannot rely on technical violations of the Labor Law but must allege actual injuries suffered as a result of the alleged wage notice and wage statement violations." <u>Id.</u> The court approved theories of "informational injury" based on the unlawful withholding of requested information but underscored that plaintiffs asserting "informational harm" need to show "some causal connection between the lack of accurate notices and a downstream harm." <u>Id.</u> at 308; <u>Martinenko v. 212 Steakhouse, Inc.</u>, No. 1:22-cv-00518 (JLR), 2024 WL 4275286, at *9 (S.D.N.Y. Sept. 24, 2024).

At the same time, in <u>Guthrie</u>, the Circuit cautioned that "some district courts have imposed too high a burden on plaintiffs-employees in § 195 cases." <u>Id.</u> at 309. <u>Guthrie</u> explained that "a plaintiff-employee may have suffered an injury-in-fact sufficient to establish standing when, for example, inaccurate or noncompliant notices prevented the employee from obtaining full payment of wages in a timely fashion." <u>Id.</u> Therefore, the Circuit held that "a plaintiff-employee who has plausibly shown that defective notices led him or her to lose wages has such a concrete interest and is not simply policing legal infractions in the abstract." <u>Id.</u> at 310.

### c) Courts Applying <u>Guthrie</u>

Since <u>Guthrie,</u> courts have linked alleged lost wages to the alleged wage statement violations. For example, in <u>Acton</u>, the Court held that "the jury's finding that Defendants paid Plaintiff all the wages he was owed….eliminates this as a basis

28

for finding a concrete injury sufficient to establish standing." <u>Acton v. Powerline Cycles, Inc.</u>, No. 22-CV-4305 (AEK), 2024 WL 4388483 at *3 (S.D.N.Y. Oct. 3, 2024). Thus, no wage violations, no standing. <u>TransUnion</u>, 594 U.S. at 417 ("No concrete harm, no standing.").

Conversely, if there are wage violations (and a plausible connection between the wage violations and the failure to provide wage notices and statements), then there is standing. <u>Castillo</u>, applying <u>Guthrie</u>, held that "the plaintiff has standing for her wage notice and wage statement violations because the plaintiff has shown a causal connection between the lack of accurate notices from the defendants and downstream harm. The plaintiff alleges that the defendants were able to hide their violations of wage and hour laws and take advantage of Plaintiff's relative lack of sophistication by failing to provide her with wage information." <u>Castillo v. Hollis Delicatessen Corp.</u>, No. 22-CV-5476 (AMD) (PK), 2024 WL 4107258, at *1 (E.D.N.Y. Sept. 6, 2024).

Another recent case applying <u>Guthrie</u> is <u>Martinenko</u>. <u>See</u> <u>Martinenko v. 212 Steakhouse, Inc.</u>, No. 1:22-cv-00518 (JLR), 2024 WL 4275286 (S.D.N.Y. Sept. 24, 2024). There, the Court explained that prior to the summary judgment stage, a plaintiff "need only allege facts that affirmatively and plausibly suggest they have standing." <u>Martinenko</u>, 2024 WL 4275286 at *10. It thus permitted a 23(b)(3) class of potential plaintiffs who "have had no opportunity to submit evidence that they have

29

standing." Id. It similarly found standing[6] for the named plaintiff Marinenko, as "Martinenko has asserted that she never received a legally sufficient wage notice; that she never complained to anyone about her wages because she did not know that they were incorrect; and that if she had been informed that she was entitled to overtime pay, she would have escalated the issue to Defendants." Id. at 10.

Other courts in this Circuit applying Guthrie reached similar results. Rosas v. M and M LA Solucion Flat Fixed Inc., No. 23-cv-01212 (DG)(MMH), 2024 WL 4131905, at *12 (E.D.N.Y. Sept. 10, 2024) (plaintiffs sufficiently established Article III standing where they "aver[ed] that Defendants' alleged failure to provide wage notices and statements caused [them] to endure uncertainty regarding [their] wages and prevented [them] from taking action to correct Defendants' wage and hour violations"); Reyes et al. v. Crystal Window & Door Sys., Ltd., No. 23-cv-02578 (RPK) (JRC), 2024 WL 4028308, at *4 (E.D.N.Y. Sept. 3, 2024) (plaintiffs adequately pleaded concrete injuries where they "allege[d] that defendant's failure to provide the notices resulted in Plaintiffs working for years without knowledge of their correct pay frequency and overtime rate").

---

[6] In Martinenko, the Court denied standing to one Plaintiff finding he failed to establish the lost wages were "traceable" to the failure to provide wage notices. See Martinenko, 2024 WL 4275286 at *10. This Court finds much of the Martinenko analysis persuasive, but respectfully parts ways with Martinenko on traceability. Rounding and timeshaving policies only succeed at reducing employee wages if the employees fail to notice. Wage notices and paystubs would alert employees to the underpayment and prevent the harm. Thus, the lost wages are directly traceable to the failure to provide wage statements.

### d) Standing Decisions Approved by <u>Guthrie</u>

Indeed, <u>Guthrie</u> itself approvingly noted three cases with identical reasoning. <u>Guthrie</u> explained that in a "number of cases, district courts have concluded that plaintiffs adequately alleged that the lack of accurate notices caused a downstream harm." <u>Guthrie</u> 113 F.4th at 311 at n. 4. <u>Guthrie</u> cited <u>Kaur v. Natasha Accessories Ltd.</u>, No. 23-CV-6948, 2024 WL 3429129 (S.D.N.Y. July 16, 2024); <u>Santamaria v. Vee Techs., Inc.</u>, No. 22-CV-4472, 2024 WL 1216579 (S.D.N.Y. Mar. 21, 2024), <u>Metcalf v. TransPerfect Translations Int'l, Inc.</u>, No. 19-CV-10104, 2023 WL 2674743 (S.D.N.Y. Mar. 29, 2023).

In <u>Kaur</u> the Plaintiff plausibly alleged that "her wage statements showed fewer hours than what she actually worked, which prevented her from determining and seeking payment for the precise amount of her unpaid wages." The Court held that this "financial harm is a tangible downstream consequence of the failure to receive required information." <u>Kaur</u>, 2024 WL 3429129, at *4.

In <u>Santamaria</u>, the Plaintiff claimed that she "suffered an injury because she was misclassified and therefore underpaid…she…didn't know she was supposed to be paid overtime, and so she lost out on the ability to advocate for it." <u>Santamaria</u>, 2024 WL 1216579, at *8. The Court found Article III standing.

In <u>Metcalf</u>, the Plaintiffs "received inaccurate wage notices…which thereby prevented them from knowing whether, and to what extent, they had been underpaid." <u>Metcalf</u>, 2023 WL 2674743, at *6.  Plaintiff also established standing.

31

So too here. Plaintiffs sufficiently link Defendants' failure to provide wage statements and wage notices to alleged wage violations.

### e) Plaintiffs Sufficiently Allege Downstream Harm

In the Complaint, the named Plaintiff alleges that "All the Class members were subjected to the same corporate practices of Defendants, including (i) failing to pay wages, including overtime compensation, due to time-shaving, (ii) failing to pay wages due to an improper policy of rounding, (iii) failing to pay wages for compensable break time, (iv) failing to provide wage statements in compliance with the New York Labor Law, and (v) failing to provide proper wage and hour notices upon hiring and as required thereafter pursuant to the New York Labor Law." Dkt. No. 1 at ¶ 24.

Plaintiffs then link the failure to provide wage statements to "Defendants' corporate-wide policies and practices" alleging the policies "affected all Class members similarly," and that "Defendants benefited from the same type of unfair and/or wrongful acts as to each Class member. Plaintiff and other Class members sustained similar losses, injuries, and damages arising from the same unlawful policies, practices, and procedures by Defendants." Dkt. No. 1 at ¶ 24.

While these allegations are sufficient at this stage of the litigation, more would likely be needed to survive summary judgment. See Martinenko, 2024 WL 4275286, at *10 (noting other cases "involved different procedural posture"); Lipstein v. 20X Hospitality LLC, No. 22-cv-04812, 2023 WL 6124048, at *9, 11 (S.D.N.Y. Sept. 19, 2023); see also Isayeva v. Diamond Braces, No. 22-cv-04575 (KPF), 2024 WL 1053349, at *17 (S.D.N.Y. Mar. 11, 2024) (at motion to dismiss stage, plaintiff-employees

"plausibly establish[ed]" that defendants' deficient wage statements "not only hindered Plaintiffs from realizing their rights at the time of payment, but also injured Plaintiffs by enabling the actual underpayment of their wages"); Mateer v. Peloton Interactive, Inc., No. 22-cv-00740 (LGS), 2022 WL 2751871, at *2 (S.D.N.Y. July 14, 2022) (at motion to dismiss stage, construing "all reasonable inferences in [plaintiff's] favor" to find Article III standing).

To survive summary judgment, potential plaintiffs would likely need to submit sufficient affidavits[7] or provide credible testimony that the failure to provide wage statements and wage notices caused downstream harm because the lack of such statements led to lost wages. See Kaur, 2024 WL 3429129, at *4; Santamaria, 2024 WL 1216579, at *8; Metcalf, 2023 WL 2674743, at *6.

If a plaintiff testifies that or submits an affidavit stating that a defendant's failure to provide wage notices "prevented them from determining and seeking payment for the precise amount of her unpaid wages," they have standing. As held in Guthrie, this would be "a tangible downstream consequence of the failure to receive required information." Kaur, 2024 WL 3429129, at *4.

Therefore, because Plaintiff has alleged lost wages, he has alleged that he suffered an injury in fact that is (i) concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant, and (iii) that the injury would

---

[7] It is possible that common proof among the class members, such as common evidence establishing Defendants' liability, Defendants' willfulness, and the specifics of the alleged unlawful policies, could be used to establish standing for all underpaid class members.

likely be redressed by judicial relief." <u>TransUnion LLC v. Ramirez</u>, 594 U.S. 413, 423 (2021). Thus, Plaintiffs have standing.

### f) *Action of Accompt* is a "Close Historical Or Common-Law Analog" For Wage Notice & Statement Claims

As explained in <u>TransUnion</u>, "central to assessing concreteness is whether the asserted harm has a "close relationship" to a harm "traditionally" recognized as providing a basis for a lawsuit in American courts." <u>TransUnion</u> 594 U.S. at 414. The Supreme Court instructs that courts should ask "whether plaintiffs have identified a close historical or common-law analog for their asserted injury."

While Plaintiffs here meet the threshold to establish standing under <u>Guthrie</u>, it is worth noting that <u>Guthrie</u> left open the door to argue that a contested statutory violation is a "close historical or common law analog."   <u>TransUnion</u> 594 U.S. at 414.

The trial court in <u>Guthrie</u> noted that no one demonstrated "how those technical violations led to either a tangible injury or something akin to a traditional cause of action." <u>Guthrie v. Rainbow Fencing Inc</u>., No. 21-CV-5929 (KAM)(RML), 2023 WL 2206568, at *6 (E.D.N.Y. Feb. 24, 2023), aff'd, 113 F.4th 300 (2d Cir. 2024). The Second Circuit similarly only discussed whether the potential risks of harm identified by the Plaintiff were sufficient to establish standing. <u>See</u> <u>Guthrie</u>., 113 F.4th at 311. To this Court's knowledge, no court in the district has asked "whether plaintiffs have identified a close historical or common-law analog" for wage statement claims.

Here, there is a historical and common law analog: *the action of accompt*.

NYLL § 195(1) requires employers to give their employees, "written notice containing the employee's rate of pay, allowances, and various other information relating to the computation of plaintiff's pay at the time of hiring." See Isayeva v. Diamond Braces, No. 22 CIV. 4575 (KPF), 2024 WL 1053349, at *15 (S.D.N.Y. Mar. 11, 2024). Thereafter, NYLL § 195(3) "requires employers to provide, for each pay period, a wage statement showing how that pay was computed, including deductions." Id.

Thus, in providing wage notices and wage statements, employers provide an account of amounts owed to employees. In this way, employers are not unlike debtors or bailees at common law required to provide an accounting of amounts owed to creditors or property to be returned to a bailor. That is exactly what the *action of accompt* provided.

In 1867, the United States Court of Claims explained that a "bill in equity to account is the modern substitute for the old common law action of *accompt*."Adams v. United States, 3 Ct. Cl. 312, 334 (1867). The Court clarified that the "*action of accompt* was not, like the action of debt, a mere process for collecting an amount due." Id. Rather, it "alleged his liability to account, and the default charged was a default in not accounting." Id. Indeed a Defendant could successfully resist the action by establishing that "the defendant had previously accounted, without regard to the fact that the balance…was still unpaid." Adams, 3 Ct. Cl. at 335.

Blackstone detailed the procedure for bringing a writ of account.

> "If no account has been made up, then the legal remedy is by bringing *a writ of account de computo* commanding the defendant to render a just account to the plaintiff, or show the court good cause to the contrary. In this action, if the plaintiff succeeds, there are two judgments: the first is, that the defendant do account (*quod computet*) before auditors appointed by the court; and, when such account is finished, then the second judgment is, that he do pay the plaintiff so much as he is found in arrear." <u>See</u>  William Blackstone[8], *Commentaries on the Laws of England,* Book III, Ch. IX (1768).

In the words of one scholar, "legal obligations to account…have been present in English law since the 11th century." <u>See</u> JA Watson, *The Duty to Account: Development and Principles*, (2016) Federation Press, 148–151. Indeed, the action to account "appears in Henry III's reign." F.W. Maitland, *Forms of Action at Common Law,* Cambridge Univ. Press, 39–52 (1909).

The action to account was recognized at common law in English Courts prior to the Revolution. <u>See</u> Viscount of Garnock v. James Wilson, Mor. 11530 (July 1714); <u>see also</u> The Action of Account, Edward W. Hinton (1928)(citing <u>Godfrey v. Saunders</u> 3 Wilson 73 (1770). Early founding era American courts recognized the common law

---

[8] The original text reads: if no account has been made up, then the legal remedy is by bringing a writ of account, de computo; commanding the defendant to render a juft account to the plaintiff, or fhew the court good coufe to the Contrary. In this action, if the plaintiff fucceeds, there are two judgments : the firft is, that the defendant do account (quod computet) before auditors appointed by the court; and, when fuch account is finifhed, then the fecond judgment is, that he do pay the plaintiff fo much as he is found in arrear.

action as well. See Ray v. Bogart, 1801 WL 722 (N.Y. Sup. Ct. 1801)(recognizing actions for accounts but dismissing appeal as untimely).

The specific harm suffered here is the inability to decipher the extent of amounts owed and, thus, the inability to proceed to recover those amounts owed.[9] First, this is exactly the type of concrete harm Guthrie recognized was sufficient to establish standing in Kaur, Metcalf, and Santamaria. See Guthrie 113 F.4th at 311 at n. 4. (citing Kaur, 2024 WL 3429129, at *4; Santamaria, 2024 WL 1216579, at *8; Metcalf, 2023 WL 2674743, at *6). Second, this harm clearly has a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." TransUnion, 594 U.S. at 414.

Indeed, a private right of action compelling a defendant to detail the exact amounts owed to a plaintiff is exactly what the *action of accompt* was for. Thus, New York's creation of a private right of action to protect an employee's legal interest in receiving an accounting of the amounts owed to them protects identical interests to the action of account. This ancient action is thus a "close historical or common law analog" to the wage notice and statement violations alleged here.   TransUnion 594 U.S. at 414.

Therefore, the Court holds that Plaintiff has established Article III standing.

---

[9] The fact the employee is owed money by the employer differentiates wage statement claims from TransUnion and Maddox v. Bank of New York Mellon Trust Company, N.A 19 F.4th 58, 64 (2d Cir. 2021). In those cases, the plaintiffs were not creditors, bailors, or employees of the Defendants, and thus the link between the accounting and amounts eventually recovered is more direct here.

## IV. CONCLUSION

Plaintiff seeks to certify a class of "current and former non-exempt employees, including journeymen, electricians, laborers, and technicians, and assemblers employed by Agir Electrical, Ltd. from May 23, 2016," alleging violations of New York Labor Law ("NYLL"). Dkt. Nos. 1, 76, 76-1. This request is GRANTED. The Court adopts Plaintiff's proposed Order in Dkt. No. 76-1 and proposed Notice in Dkt. No. 78-1.

Plaintiff's Motion for Final Collective Certification is DENIED as moot. Defendant's Motion to Decertify the Collective Action is DENIED.

The Clerk is respectfully requested to close Dkt. No 116.

SO ORDERED.

DATED:    New York, New York
          October 11, 2024

*Jennifer E. Willis*

JENNIFER E. WILLIS
United States Magistrate Judge